THE STATE, *Appellant*, v. THE ST. LOUIS & SAN FRANCISCO RAILWAY COMPANY.

### Division One, December 22, 1894.

1. **Railroad**: CONTRACT: COVENANT TO PAY DEBTS OF ANOTHER, ACTION ON. Where a railroad company covenants to pay the debts of another company, the creditors of the latter may sue on the covenant.

2. ——: ——: AGREEMENT TO SAVE HARMLESS, ACTION ON. Where, however, the agreement is to "save harmless" another against the claims of third persons, the latter can not sue on the agreement, as it is not made for their benefit.

3. ——: ——: ——. Railroad companies entered into an agreement whereby one agreed to save the other harmless from all its obligations and in the same clause agreed "to pay and surrender the same canceled" as fast as they were obtained. *Held*, that this was only an agreement by one to "save harmless" the other, and, hence, the state as a creditor of the latter could not sue thereon.

*Appeal from St. Louis City Circuit Court.*—HON. JAMES E. WITHROW, Judge.

AFFIRMED.

*R. F. Walker*, Attorney General, and *James O. Broadhead* for appellant.

(1) A party for whose benefit a stipulation in a contract is made, may maintain a suit on such stipulation in his own name. *Fitzgerald v. Barker*, 70 Mo. 687. This doctrine was first confined to suits on simple contracts. *Bank v. Benoist*, 10 Mo. 519; *Robbins v. Ayres*, 10 Mo. 538; *Meyer v. Lowell*, 44 Mo. 328;

*Flannigan v. Hutchinson*, 47 Mo. 237. But this rule was afterward extended to covenants. *Rodgers v. Gosnell*, 51 Mo. 466; *Fitzgerald v. Barker*, 85 Mo. 14; *Rodgers v. Gosnell*, 58 Mo. 589. See, also, *Van Schaick v. Railroad*, 38 N. Y. 346; *Coster v. Mayor*, 43 N. Y. 399; *Lawrence v. Fox*, 20 N. Y. 268; *Schuster v. Railroad*, 60 Mo. 290; *Ellis v. Harrison*, 104 Mo. 270; *Lusk v. Ridge*, 41 N. Y. 206; *Railroad v. Hopkins*, 18 Kan. 494; *Hume v. Brower*, 25 Ill. App. 130; *Snale v. Ives*, 85 Ill. 279; *Shofer v. Kerting*, 107 Ill. 344; *Dean v. Walker*, 107 Ill. 540. In some of these cases a distinction is drawn between simple contracts and contracts under seal, but in others this distinction is repudiated, as it has been in Missouri, notably the case of *Kimbal v. Noyer*, 17 Wis. 698; and *Bassett v. Hughes*, 43 Wis. 319. (2) It is not necessary to specify the particular debt which is assumed to be paid. *Shofer v. Kerting*, 107 Ill. 346; *Schmidt v. Glade*, 126 Ill. 470; *Dean v. Walker*, 107 Ill. 540; *Redelsheimer v. Miller*, 107 Ind. 486; *Cross v. Truesdale*, 28 Ind. 44; *Kingsbury v. Earle*, 27 Hun, 141; *Schuster v. Railroad*, 60 Mo. 290; *Banks v. White*, 14 Neb. 373; *Delaney v. Anderson*, 54 Ga. 586; *Railroad v. Hopkins*, 18 Kan. 494; *Raum v. Kaltwasser*, 4 Mo. App. 573; *Brenner v. Luth*, 28 Kan. 581; *Snell v. Ives*, 85 Ill. 279; *Anthony v. Herman*, 14 Kan. 494. (3) The execution of the deed of indenture between the South Pacific Railroad Company and the Atlantic & Pacific Company operated as a consolidation and merger of the two companies into one, to wit, the Atlantic & Pacific Company, and imposed a liability upon the Atlantic & Pacific Company to pay the debts of the other company, and this obligation was evidenced by a written contract under seal to pay the debts and liabilites of the South Pacific Company. *Tomlinson v. Branch*, 15 Wall. 460; *Railroad v. Moffeitt*, 75 Ill. 524; *Rail-*

road v. Branch Sons & Co., 59 Ala. 139; Eaton v. Hunt, 20 Ind. 457; Railroad v. Georgia, 92 U. S. 665; Washburn v. Cass Co., 3 Dillon, 251–260; Railroad v. Powell, 40 Ind. 37; Railroad v. Hendricks, 41 Ind. 59; Paine v. Railroad, 31 Ind. 283; Bryan v. Ins. Co., 16 Fed. Rep. 139; Thompson v. Abbott, 61 Mo. 177; Mt. Pleasant v. Beckwith, 100 U. S. 514; Company v. Company, 58 Miss. 846; Morawetz on Private Corporations, secs. 904, 905, and cases cited. (4) The execution of the tripartite agreement between the three companies operated to effect a consolidation, by which the Atlantic & Pacific Company, an insolvent company, became merged into the other two companies, through the instrumentality of the St. Louis & San Francisco Company, which owned nearly all the stock of the Atlantic & Pacific Company, both the last named companies being at the time under the same management. Morawetz on Private Corporations, sec. 943; Thompson v. Abbott, 61 Mo. 177; Eaton v. Hunt, 20 Ind. 457; Railroad v. Georgia, 96 U. S. 665; Act of March 24, 1870, sec. 57, Sess. Acts of 1870, p. 90; 1 Wag. Stat. pp. 314–315. The consolidation of two companies does not necessarily work the dissolution of both. Company v. Georgia, 92 U. S. 667. (5) But, if the tripartite agreement did not effect a consolidation, the obligations of that agreement were that the San Francisco Company would pay all the debts and liabilities of the Atlantic & Pacific Company, and the debt due the state of Missouri was one of those liabilities. (6) The intention of the parties to the tripartite agreement must be gathered from a fair interpretation of the language of the instrument itself, and when the engagement of the parties, and the extent and manner of their undertaking has been reduced to writing, all oral testimony of a previous colloquium between the parties, or of conversations or declarations at the time

it was completed or afterwards, is incompetent and inadmissible to contradict or vary the terms of the written instrument. Greenleaf on Evidence, secs. 275–277; *Brenner v. Luth,* 28 Kan. 581; 2 Wharton on Evidence, 920–923.  (7) The tripartite agreement was a Missouri contract and its interpretation and its obligations must be determined by the laws of Missouri, because, although signed in Boston, it did not become binding upon the parties until it was filed in the office of the secretary of state. See act of March 24, 1870, sec. 57. Sess. Acts òf 1870, p. 90; Blue Book, p. 171; R. S. 1889, sec. 2568; 1 Wag. Stat. pp. 314–315; 3 Am. & Eng. Encyclopedia of Law, 543, 544; *Cox v. United States,* 6 Pet. 361; *Bank v. Daniels,* 12 Pet. 32; *Tilden v. Blair,* 21 Wall. 246; 2 Kent's Com., 460 and note; *Mansfield v. Robinson,* 2 Burr. 1077; *Fanning v. Consequa,* 17 John. 519; *Freese v. Brownell,* 35 N. J. 286; *Campbell v. Nicholas,* 33 N. Y. 81; *Pomeroy v. Ainsworth,* 22 Barb. 128; *Meyers v. Carr,* 12 Mich. 63; *Wiston v. Stodder,* 8 Martin, 134.  (8) The debt is not barred by limitation. *Carr's Adm'r v. Hurlburt,* 41 Mo. 269; *Chidsey v. Powell,* 91 Mo. 626; *Mastin v. Branham,* 86 Mo. 644; *Wood v. Marawitz,* 9 Atl. Rep. (R. I.), 427.  And where there is an acknowledgment of indebtedness, it will be taken to relate to the demand in suit, and the burden is upon the defendant to show that it related to another debt.  Wood on Limitation, p. 162, sec. 68.  The obligation to pay in this case was a contract *in solido,* and commences from the date of the obligation *(Ammonett v. Montague,* 75 Mo. 49), and, being a contract in writing and under seal, is not barred until ten years after it was made.  (9) When an acknowledgment is made before the debt is barred, the statute will begin to run from the time of the acknowledgment. *Chidsey v. Powell,* 91 Mo. 626; *Mastin v. Braham,* 86 Mo. 644.

*E. D. Kenna, Lee & McKeighan* and *L. F. Parker* for respondent.

(1) The tripartite agreement of January 31 between the defendant, the Atchison, Topeka & Santa Fe Railroad Company, and the Atlantic & Pacific Railroad Company, was not made for the benefit of the state with respect to the debt sued on, nor did said agreement contemplate or intend to make the state a beneficiary with respect to such debt, nor was such debt provided for in said agreement, nor could or can the state maintain an action upon, or by reason of, such agreement against the defendant. *First.* In order that a third party may sue upon a contract made between other parties, it must appear that he is the person intended to be benefited, that it was made for him as its primary and leading object, and not merely for the benefit of the contracting parties. *Simson v. Brown,* 68 N. Y. 355; *Wright v. Terry,* 2 S. Rep. (Fla.) 6; *Wheat v. Rice,* 97 N. Y. 301; *Pardee v. Treat,* 82 N. Y. 385; *Lorillard v. Clyde,* 122 N. Y. 498; *Markel v. Tel. Co.,* 19 Mo. App. 80; *Burton v. Larkin,* 36 Kan. 246; *Bank v. Grand Lodge,* 98 U. S. 123; *Dow v. Clark,* 7 Gray, 198; *Merrill v. Greene,* 55 N. Y. 270; *Amonett v. Montague,* 63 Mo. 201; *Bank v. Aull,* 80 Mo. 199; *Garnsey v. Rogers,* 47 N. Y. 238; *Cathcart v. Foulke & Sons,* 13 Mo. 561; *Ellis v. Harrison,* 104 Mo. 270; *Cochrane v. Stewart,* 63 Mo. 424; *Austin v. Seligman,* 18 Fed. Rep. 519. *Second.* The bond given to the state by the South Pacific Railroad Company was not known to the defendant at the time of the making of the tripartite agreement. The contract was not made with reference to it, and, therefore, said contract should not be held to embrace or include it. The consideration for a promise moving from the promisee to a third person, but

unknown to the promisor, is insufficient to support an action on the promise. *Ellis v. Clark*, 110 Mass. 389. A contract embraces only matters concerning which the parties propose to contract, and not other matters unknown to them, however general the terms employed. *Case v. Cushman*, 3 W. & S. 544; *Schnieder v. Leibengood*, 4 Pa. St. 308. Knowledge or ignorance of facts necessary to the application of the instrument to the person or things discussed, or even the belief of the parties, is important to put the court in the position of the parties, so as to determine what was meant. 2 Parsons on Contracts [7 Ed.], 562, 692; *Blair v. Railroad*, 89 Mo. 383; 1 Story's Eq. Jur., sec. 145; *Pomeroy v. Benton*, 57 Mo. 551. *Third.* The only part of the tripartite agreement which by any possibility could give a right to sue the defendant on account of the debts of the Atlantic & Pacific is that part which provides for the payment of the then past due coupons. The remainder of the contract with respect to the debts of the Atlantic & Pacific is substantially a contract to save harmless or to indemnify the Atlantic & Pacific and the Atchison, Topeka & Santa Fe Railroad Companies. Where a contract is in substance one for indemnity, third parties can not sue on the same. *Peacock v. Williams*, 98 N. C. 324; *City of Kansas ex rel. v. O'Connell*, 99 Mo. 367; *Vilas v. Page*, 13 N. E. Rep. 743; *Roddy v. Railroad*, 104 Mo. 234. *Fourth.* The general passage or clause in the tripartite agreement, as well against such as are hereinbefore enumerated, classified and described as any and all others now existing, can not be construed to enlarge the purpose and intention of the parties beyond mere minor claims of the same class and character as those specifically described. *Shelton v. Pease*, 10 Mo. 473; *Miller v. Wagenheuser*, 18 Mo. App. 11; *Torrence v. McDougall*, 12 Ga. 526; *Schulenberg v. Magwire*, 42 Mo. 391;

*Grumley v. Webb*, 44 Mo. 444; *Cochrane v. Stewart*, 63 Mo. 424; *County v. Wood*, 84 Mo. 489; Broom's Legal Maxims, 588, 747 and 647; *Blair v. Railroad*, 89 Mo. 383; Powell's Notes to Wood's Cont., 206. (2) While it is true as a general principle that laches can not be attributed to a sovereign power, nor a state be prejudiced by the neglect of its officers, yet an exception arises, where the government descends into business transactions, and, where the officers of the government have been guilty of laches, the government will be precluded from forcing such claims. *Cooke v. United States*, 91 U. S. 389. Where laches does not operate as a statutory or positive bar, it may create a presumption that parties have waived or abandoned their rights. *Tazewell's Ex'r v. Saunders' Ex'r*, 13 Gratt. (Va.) 354; *Nelson v. Carrington*, 4 Munf. (Va.) 332; *Burdett v. May*, 100 Mo. 13; *Burgess v. Railroad*, 99 Mo. 496. The claim of the state against the South Pacific Railroad Company, arising out of the bonds sued upon, had been abandoned by the state before the institution of this action. Abandonment may be shown by facts which warrant the inference of such abandonment. *Chouteau v. Iron Works*, 83 Mo. 73. (3) This claim is barred by the statute of limitations. The state is not a party, either to the tripartite agreement or to the deed of conveyance from the South Pacific to the Atlantic & Pacific. If it were granted that the state had at any time a cause of action against the Atlantic & Pacific or the defendant, it would be an obligation implied from the covenants of those instruments and from the fact outside the covenants, and to be proven *aliunde*, that the state was a creditor of the South Pacific. *Railroad v. Miller*, 32 Ill. App. 259; *Middleton v. Twombly*, 26 N. E. Rep. 621; *Dismukes v. Helpen*, 47 Ark. 317; *Ins. Co. v. Middleport*, 31 Fed. Rep. 874; *McAdaras v. King*, 10 Mo. App. 578; *Fitzgerald v. Barker*, 70 Mo.

685; *Bank v. Grand Lodge*, 98 U. S. 123; *Lawrence v. Fox*, 20 N. Y. 16; *Jones v. Higgins*, 80 Ky. 409. Where evidence outside of a contract is necessary to show an obligation in favor of a plaintiff, then the period of five, and not the period of ten, is the limitation. *Meneffee v. Arnold*, 51 Mo. 536; *Carr v. Thompson*, 67 Mo. 472. (4) The defendant can set up the claim of the South Pacific against the state as a counterclaim or defense against the plaintiff's demand, and neither the South Pacific, the Atlantic & Pacific nor this defendant was bound to first present it as a claim to the state auditor. If the legality and justice of the claim be established, defendant will not be denied the benefit of it. *U. S. v. Mann*, 2 Brock. 9. The claim of the South Pacific against the state is not a set-off, but a counterclaim. R. S. 1889, sec. 2050; *McAdow v. Ross*, 53 Mo. 204; *Richey v. Haywood*, 71 Mo. 560; Pomeroy on Remedies, secs. 731, 732, 733 and 729; *Van Epp v. Harrison*, 5 Hill, 63; *Whitbeck v. Skinner*, 7 Hill, 53; *Mayor v. Maybie*, 13 N. Y. 151; *Somers v. Davis*, 2 Sandford, 229; *Hay v. Short*, 49 Mo. 142; Wood on Remedies, secs. 602, 603 and 282; *Ord v. Ruspine*, 2 Esp. 569; *Riddle v. Kreinbisch*, 12 La. Ann. 297; *Gillick v. Turnpike Co.*, 14 N. J. L. 545; *Monroe v. Henson*, 9 Ga. 398.

BLACK, P. J.—The state of Missouri brought this action at law against the St. Louis & San Francisco Railway Company to recover $300,000 and the interest thereon. The state's cause of action is founded on a bond, dated June 10, 1868, whereby the South Pacific Railroad Company agreed to pay to the state the above named amount in three equal annual installments falling due on the first days of June, 1874, 1875 and 1876. The claim of the state is that this bond became the debt of the Atlantic & Pacific Railroad Company

because of an agreement on the part of the last named company to pay the debts of the South Pacific Railroad Company; and that the defendant became liable to the state because of its agreement to pay the debts of the Atlantic & Pacific Railroad Company.

The principal defenses are: *First.* That the state never had any cause of action against the Atlantic & Pacific Railroad Company. *Second.* That it has no cause of action against the defendant company. *Third.* That the South Pacific Railroad Company held, and through it the Atlantic & Pacific Railroad Company holds, a counterclaim against the state in excess of the state's demand. *Fourth.* That the state's demand is barred by lapse of time, this suit having been commenced on January 30, 1890.

In view of the amount of money involved, we state the facts disclosed by the record with some detail. By the act of twenty-fifth of December, 1852, the Pacific Railroad was required to apply lands granted to the state by the act of congress of June 10, 1852, to the construction of a part of its main line and the remainder to the construction of the southwest branch which began at Franklin, near St. Louis, on the main line and extended west to Springfield, and thence west to the west line of the state. The state from time to time guaranteed bonds and issued its own bonds to aid in the construction of this branch road, amounting to over $4,000,000. For its own protection the state reserved a first lien on the branch road, its franchise and all of its lands. The Pacific Railroad made default in the payment of the interest on these state aid bonds, and thereupon the legislature passed an act entitled "An act to provide for the sale of certain railroads and property by the governor, to foreclose the state's lien thereon, and to secure an early completion of the Southwest Branch Pacific, the Platte Country, the St.

Louis & Iron Mountain and the Cairo & Fulton
Railroads of Missouri," which act was approved on the
nineteenth of February, 1866.

Pursuant to this act Governor Fletcher took pos-
session of the southwest branch of the Pacific railroad
and all the property thereto belonging, including the
before mentioned lands set apart to be sold and the
proceeds used in the construction of the branch road.
He at the same time appointed three commissioners to
operate the road and to sell it as provided in said act.
The commissioners advertised the road for sale, but the
bids made thereunder were rejected on the ninth of
May, 1866.   On the next day the governor directed the
commissioners to sell the road at private sale pursuant
to the seventh section of the act.   On the same day
John C. Fremont made a written bid, which was
accepted and the bid approved by the governor.   A
formal contract was executed, setting forth the terms
of the bid or written proposition.   The principal features
of the contract are that Fremont was to pay the state
for the road, its franchises and the aid lands the sum
of $1,300,000, one fourth cash, on delivery of a deed,
and the balance in four equal annual installments, and
he was to complete the road within a stated time.   The
written bid or proposal contains the following stipula-
tions, which are also set forth in the formal contract:
"That this purchase shall be made subject to the con-
ditions of forfeiture enumerated in the fourteenth sec-
tion" of the act of February 19, 1866; and that Fre-
mont and his associates shall have the right to borrow
money for the completion of the road and to secure
the same "by mortgage or deeds of trust or pledge of
the finished and unfinished portions of the road and
appurtenances and lands acquired by said purchase,
without being subject in relation to such loans, bonds,
mortgages, and pledges to any conditions or restrictions

enumerated in the tenth section of said act." On the fourteenth of June, 1866, the state executed to Fremont a deed, and he at the same time paid the state the one fourth of the $1,300,000, and executed to the state a mortgage on all the property so conveyed to him, to secure the deferred payments and also to secure the performance of the other provisions of the contract. The mortgage provides for a public sale in case of default; but it must be remembered also that the fourteenth section of the act of nineteenth of February, 1866, concerning a forfeiture in case of default, was made a part and parcel of the contract secured by the mortgage.

At the date of the transactions last recited, the road had been completed from Franklin to Rolla, in Phelps county. Fremont and his associates organized a corporation under the name of the Southwest Pacific Railroad, and he conveyed all the property which he had acquired from the state to that company, subject to the mortgage given by him to the state. On the fifteenth of September, 1866, the Southwest Pacific Railroad Company executed a mortgage to Yelverton & Ward to secure a proposed issue of $7,500,000 of bonds. About $2,300,000 of these bonds were issued, and either sold or pledged. Fremont and his corporation extended the road to the Gasconade river, a distance of about twelve miles, and built a bridge over that river. He and his company failed to pay the first deferred installment of the purchase money due the state, and otherwise failed to comply with the terms of his contract. Because of such default, Governor Fletcher took possession of the road on the twenty-first of June, 1867, and appointed Clinton B. Fisk agent of the state to operate the same. The legislature then passed an act entitled, "An act to dispose of the Southwest Pacific Railroad and other property belonging thereto, and

to secure the early completion of said road;" which act was approved on the seventeenth of March, 1868. By the terms of this act the legislature made a declaration that the property sold to Fremont had been "forfeited to, and the title vested in, the state of Missouri," and that the state resumed the forfeited railroad, franchises and property "discharged and free from all liens, obligations and incumbrances placed on the same by said Fremont, his associates or assigns." The second section provides "That the said railroad, its franchises, and all other property hereinbefore described, be, and the same is hereby granted to A. C. Kingsland * * * their associates and assigns, in fee simple, upon the condition and reservation hereinafter mentioned, in trust for the company hereinafter provided for."

This act provides that Kingsland and others shall organize a new company, to be known as the "South Pacific Railroad Company;" that the new company shall complete the road within a given time, and to that end was required to deposit $1,500,000, to be paid out as the work progressed. Authority was given it to borrow $7,250,000, and to secure the same on the road and other property so acquired from the state. The seventeenth section provides: "The said South Pacific Railroad Company shall pay to the state of Missouri the sum of three hundred thousand dollars—one hundred thousand dollars to be paid on or before the first day of June, 1874; and the sum of one hundred thousand dollars on or before the first day of June, 1875; and one hundred thousand dollars on or before the first day of June, 1876—which shall be in addition to the other conditions imposed by this act, and which sum shall be secured, to be paid to the state of Missouri by the bond of said company, with approved security, and which bond shall be given before said company takes possession of said road."

The new company was duly organized, and it gave the bond mentioned in the section just quoted, with two sureties. The governor approved the bond, though it appears the sureties were mere straw men and financially worthless. This. is the bond upon which the state founds this action.

After the South Pacific Railroad Company had been organized, and after it had accepted the act last mentioned, it took up and retired the larger portion of the $2,300,000 of issued Yelverton & Ward bonds, at a cost to it of about $436,000. This was done by the aid and assistance of the .Atlantic & Pacific Railroad Company, a corporation created by an act of congress in 1866, with power to construct a railroad and tele-graph line from Springfield, in this state, to the west line of the state, and then west to Albuquerque, New Mexico, and thence west to the Pacific ocean. In 1871 the South Pacific Railroad Company presented to the legislature of this state a claim for the amount paid out, as before stated, in taking up the issued Yelverton & Ward bonds, and at the same time offered to surrender the claim as satisfied, if the state would release it from the payment of the $300,000 bond. A bill was intro-duced to that effect, but the legislature adjourned before any action was taken on it. A like bill had failed to pass at a previous session. This is the claim set up in the answer as a counterclaim.

On the twenty-fifth of October, 1870, the South Pacific Railroad Company executed a deed to the Atlantic & Pacific Railroad Company. This deed, it will be seen, bears date prior to the maturity of any of the installments payable to the state by the terms of the $300,000 bond. It professes to be made pursuant to a prior agreement between the South Pacific Company, and the Atlantic & Pacific Company, and by authority of the act of twenty-fourth of March, 1870, amendatory

of the general railroad law. The consideration expressed is seventy-eight thousand, eight hundred and ten shares of preferred stock, and thirty-one thousand and eighty-seven shares of common stock, of the Atlantic & Pacific Railroad Company, to be turned over to the shareholders of the South Pacific Company. It uses the usual words of grant, and conveys all the property, real and personal, including the aid lands, to the Atlantic & Pacific Company, subject to the following agreements, that is to say:

*First.* That the Atlantic & Pacific Railroad Company shall, and it hereby does, assume the payment of the principal and interest of the bonds, amounting to $7,250,000, secured by the aforesaid mortgage for that amount upon the property of the South Pacific Railroad Company, and also the payment of all other debts, and the fulfilment of all other obligations of the said South Pacific Railroad Company, and shall save harmless, indemnify and protect the said South Pacific Railroad Company and the present stockholders of, or parties beneficially interested as such in, that company, from all claim or demand for, or by reason of, such bonds and mortgage or other debts or obligations.

"*Second.* That said Atlantic & Pacific Company shall also observe, perform and fulfill all of the conditions of the charter of the South Pacific Railroad Company and all laws and regulations of the state of Missouri, to which the last mentioned company is, or shall be, subject, and shall do all acts and things whatsoever incumbent upon the last mentioned company, to do under such charter, and such laws and regulations."

This deed was signed by the Atlantic & Pacific Company as well as by the South Pacific Company. The stockholders of the South Pacific Company gave their consent to this transaction. The state insists, it may

be stated here, that by this deed the Atlantic & Pacific Company assumed and agreed to pay the $300,000 bond given to it by the South Pacific Company.

The Atlantic & Pacific Company completed the road to the west line of the state, and from there west to Vinita, in the Indian Territory, a point about fifty miles west of the western boundary of this state. The money used to complete the road to the state line was the deposit of $1,500,000 made by the South Pacific Company and bonds issued by that company to the amount of $7,250,000, authorized by the act of March 17, 1868, and by the sale of other bonds issued by the Atlantic & Pacific Railroad Company and secured by second and subsequent mortgages.

The Atlantic & Pacific Company made default in the payment of interest, and thereupon one of the holders of bonds brought suit to foreclose some of the second mortgages, in the circuit court of the United States. Such proceedings were had that all of that part of the road in this state was sold to William F. Buckley, who purchased the same, subject to the first or $7,250-000 mortgage, for and in the interest of bondholders. He at once, in 1876, conveyed the property so purchased to the defendant, the St. Louis & San Francisco Railway Company, a corporation then organized under the laws of this state.

The agreement upon which the state seeks to hold the defendant for the payment of the $300,000 bond, is the tripartite agreement, dated the thirty-first day of January, 1880, entered into between the defendant, the St. Louis & San Francisco Railway Company, party of the first part, the Atlantic & Pacific Railroad Company, party of the second part, and the Atchison, Topeka & Santa Fe Railroad Company, party of the third part. This agreement sets forth, by way of recitals, these facts:    That the San Francisco company owns and

operates a line of road from St. Louis to the western line of the state, and a branch from Pierce City westwardly, intended to reach Wichita, in the state of Kansas; that the Atlantic & Pacific Company owns the fifty miles of road in the Indian Territory, operated by the San Francisco company, and the franchise to build a road west to the Pacific coast, with a large land grant; that the Atchison company operates a road through the states of Kansas and Colorado, with a branch to Wichita, and expects to complete its main line to Albuquerque, New Mexico; that the San Francisco and the Atchison companies own more than seven eighths of the stock of the Atlantic & Pacific company; that all parties desire to complete a line from Albuquerque through to the Pacific. Agreements are then made in respect of the construction of such "Western Division" of the Atlantic & Pacific, and the issue of bonds to be secured by mortgages for that purpose. Further agreements are made to the end that the three lines shall be operated as a through line from the Missouri and Mississippi rivers to the Pacific coast for a period of thirty years from the date of a mortgage to be placed on the Western Division of the Atlantic & Pacific. The contract sets forth the following further recitals:

"And, whereas there are now issued and outstanding stock, bonds, obligations, and debts, which are apparent obligations and liabilities of said party of the second part, against some of which valid defenses may exist, and which, without recognizing their validity, are classified, enumerated as follows, namely:

"1. First mortgage land grant and railroad bonds of the South Pacific Railroad Company outstanding to the amount of $7,188,500.

"2. First mortgage railroad and land grant bonds of the Atlantic & Pacific Railroad Company (Central Division), amounting to $1,189,905, with interest

at the rate of six per cent., unpaid since November 1, 1875.

"3. First mortgage land grant bonds of the Atlantic & Pacific Railroad Company (Central Division), amounting to $795,000, with interest at six per cent., payable at maturity of the bonds in 1901.

"4. Atlantic & Pacific Railroad Company six per cent., gold scrip, and blue bonds amounting to $3,794.

"5. Atlantic & Pacific Railroad Company's income bonds, due in 1883, amounting to $2,800.

"6. Atlantic & Pacific Railroad Company's equipment bonds, amounting to $753,000, with interest at ten per cent., unpaid since.

"7. Atlantic & Pacific Railroad Company's land debentures, amounting to $300,000, with interest at ten per cent., secured by contracts for land sold, which are assigned to trustees to secure said debentures.

"8. Capital stock (common), amounting to $8,360,300, at par.

"9. Preferred stock (Missouri Division), amounting to $10,000,000, at par.

"10. Preferred stock (Central Division), amounting to $1,400,000, at par.

"11. First mortgage land bonds (Missouri Division), $27,500.

"12. Second mortgage bonds (Missouri Division), $6,000.

"13. Floating debts amounting to about $25,000.

"Which constitute the entire stock and bonds of the party of the second part, and all their debts and liabilities, so far as known to either of said first or second parties."

It is then agreed, among other things:

"Second. The party of the first part hereby agrees to and with the party of the second part and

the party of the third part, severally, to take up, pay
and cancel and surrender canceled, to the party of
the second part, all the overdue coupons on the bonds
of said party of the second part now outstanding; and
also agrees to save the parties hereto of the second
part and of the third part, severally, harmless from all
bonds, scrip, debentures, floating debt, and other
obligations and liabilities of the party of the second
part, as well against such as are hereinbefore enumera-
ted, classified, and described as any and all others now
existing, and to pay and surrender the same canceled
and discharged to the party of the second part as fast
as the same are obtained by the party of the first part,
by payment or otherwise.   Always excepting the first
mortgage, railroad and land grant bonds of the Cen-
tral Division, amounting to $1,189,905, and numbered
2 in the enumeration above given and referred to;
but the overdue coupons of said last named bonds the
party of the first part is to pay, cancel, and surrender
canceled, forthwith, to the party of the second part.
And also excepting the land grant bonds of the Central
Division of said second party, the principal, amount-
ing to $795,000, and interest of which will fall due in
the year 1901.

"And, in consideration therefor, the party of the
second part agrees to deliver to the party of the first
part notes running six years, with the option of paying
the same or any of them at any time before maturity,
and bearing interest at the rate of six per cent. per
annum to the amount of $711,968.87."

The stipulation concerning the notes last men-
tioned is further explained by a supplemental agree-
ment made on the same day by the San Francisco
Company and the Atchison Company, whereby it is
provided the San Francisco Company shall not demand
or receive said notes, except as that company shall pay

and surrender to the Atlantic & Pacific Company overdue coupons on the $1,189,905 bonds mentioned in the schedule of debts, and except as the San Francisco Company shall obtain the fourteen thousand shares of preferred stock of the Atlantic & Pacific Company (Central Division) and deliver the same to trustees for the benefit of the Atchison and San Francisco Companies. At the date of this tripartite agreement the Atlantic & Pacific Company was insolvent and has ever since continued to be insolvent.

Before taking up the important question in this case it is deemed proper to say a few words concerning the counterclaim set up in the answer. The state's cause of action is based on the $300,000 bond executed by the South Pacific Railroad Company, pursuant to the seventeenth section of the act of the seventeenth of March, 1868. That is the same act by which the state granted the railroad and aid lands to Kingsland and others, in trust for the South Pacific Railroad Company. For the defendant it is insisted that the state by the terms of this legislative grant, became bound to turn over the property to that company, free and clear of all incumbrances. This, it is argued, the state did not do, because the legislative declarations of forfeiture did not cut out or foreclose the Yelverton & Ward mortgage placed upon the property by Fremont's company, and hence the South Pacific Railroad Company had a legal demand against the state for at least $436,000, laid out in taking up and retiring the $2,300,000 of issued Yelverton & Ward bonds. This alleged counterclaim passed, for whatever it was worth to the Atlantic & Pacific Railroad Company by the deed to it dated the twenty-sixth day of October, 1870. In the view we take of the case, it is unnecessary to pass upon the validity of this counterclaim. It is enough to bear in mind the fact that both

of said railroad companies have ever disputed and denied the right of the state to collect the $300,000 bond, for this fact is entitled to some consideration when we come to construe the tripartite agreement.

The first important question is whether the state can maintain an action against the Atlantic & Pacific Railroad Company, to recover the amount of this $300,000 bond, on the covenants of that company in the deed to it from the South Pacific Railroad Company, dated the twenty-sixth of October, 1870.

Persons who are not parties to a contract may acquire rights under it by assignment and by novation. In such cases they become parties thereto. But the general rule is that strangers to a contract can not sue upon it. There are, however, some exceptions to this rule. One is that where property is placed in the hands of another person who agrees to deliver the property or the proceeds arising from the sale thereof to a third person, such third person has a cause of action against the person in whose hands the property was placed. There is another exception more in point in this case, asserted by most of the courts in this country. This exception may be stated as follows: Where one person, for a valuable consideration, makes a promise to another for the benefit of a third person, such third person may maintain an action upon the promise. This principle has found a strong foothold in the former adjudications of this court. It was first limited to promises contained in simple contracts. *Bank v. Benoist*, 10 Mo. 519; *Robbins v. Ayres*, 10 Mo. 538; *Meyer v. Lowell*, 44 Mo. 328; *Flannagan v. Hutchinson*, 47 Mo. 237. But it was subsequently extended so as to apply to covenants—contracts under seal. *Rogers v. Gosnell*, 51 Mo. 466; s. c., 58 Mo. 589; *Fitzgerald v. Barker*, 70 Mo. 687; s. c., 85 Mo. 14. It is not necessary to specify the debts which the prom-

isor or covenantor assumes and agrees to pay. It is enough to speak of them as a class, and the particular debt in question may be shown to be one which falls within that class. *Schuster v. Railroad*, 60 Mo. 290; *Schmidt v. Glade*, 126 Ill. 485; *Snell v. Ives*, 85 Ill. 279; *Brenner v. Luth*, 28 Kan. 581.

Applying these principles of law to the deed from the South Pacific Railroad Company to the Atlantic and Pacific Railroad Company, dated the twenty-sixth of October, 1870, there can be no doubt but the last named company assumed and agreed to pay all of the debts of the former, and that the state had a cause of action against the latter to recover the amount of the $300,000 bond. It is to be observed in the first place, that by this deed the South Pacific Company conveyed and transferred all of its property and asset of every kind and description. It had nothing left. The stock held by the stockholders was even surrendered and stock in the grantee company taken therefor. In consideration of all which the deed goes on to say, the grantee company "shall, and it hereby does, assume the payment" of the $7,250,000 of bonds, "and also the payment of all other debts, and the fulfillment of all other obligations of the South Pacific Railroad Company," etc. This deed, it is to be remembered, was signed by the grantee company, a fact wanting in some of the cases before cited. The scheme, taken as a whole, was simply this: that the Atlantic and Pacific Company took all the property of the South Pacific Company, and assumed and agreed to pay all of its debts of every kind and description. A clearer case for the application of the principle of law before stated can scarcely be imagined. The Atlantic & Pacific Company, for all practical purposes, took the place of the South Pacific Company, and, that the state had a cause of action against the Atlantic & Pacific, there can be

no doubt. To our minds, the proposition is too clear to call for further discussion.

A question is made in the briefs whether this deed is to be deemed a purchase and sale, or whether it is, in substance and effect, a consolidation of the two companies. We do not regard the question one of importance in this case. No matter what name is given to the transaction, there was a clear covenant on the part of the Atlantic & Pacific Company to pay all the debts of the other company, and we have already said sufficient as to the right of the state to sue on that covenant.

This brings us to the far more difficult question, whether the state can maintain this suit against the St. Louis & San Francisco Railway Company, on the tripartite agreement of the thirty-first of January, 1880. It may be observed here that the principle of law before stated, namely, that, where one person makes a promise to another for the benefit of a third person, such third person may sue on the promise, must be kept within reasonable bounds. To entitle a third person to sue it must clearly appear that the contract was made for the benefit of such third person or persons, *as one of its principal objects. Howsmon v. Trenton Water Co.*, 119 Mo. 306. A mere indirect or incidental benefit is not sufficient. *Burton v. Larkin*, 36 Kan. 246; *Bank v. Grand Lodge*, 98 U. S. 123. If the agreement or covenant is simply one to indemnify and save harmless one of the parties to the contract, against the claims of third persons, then such third persons can not sue upon the agreement or covenant. Such a contract, whether under seal or not, is not a contract for the benefit of third persons within the meaning of the exception to the general rule. *Kansas City ex rel. v. O'Connell*, 99 Mo. 357; *Weller v. Goble*, 66 Iowa, 113; *Howsmon v. Trenton Water Co., supra.*

Now, to understand this tripartite agreement we must first see what were the leading objects sought to be accomplished by it. Two of the companies, the Atchison and the San Francisco, owned and operated separate but connecting lines. They desired to build a further connecting line from a point in New Mexico west to the Pacific coast, and to operate the whole as a continuous line under a traffic agreement. In building the new line they desired to avail themselves of the charter and land grant of the Atlantic & Pacific Company. These were the leading objects in view. To accomplish them the Atchison & San Francisco companies acquired seven eighths of the stock of the Atlantic & Pacific. That company was insolvent, and many of its debts were secured by mortgages on the road owned and operated by the San Francisco Company. As the new road was to be built to a large extent by aid furnished by the two solvent companies, they undertook to determine which should, as between themselves, liquidate the debts of the Atlantic & Pacific. To that end they made the schedule of debts and liabilities of the Atlantic & Pacific, before set out; but they were careful to say valid defenses might exist as to some of them. The San Francisco Company then agreed to and with the other companies, *first*, "to take up, pay and cancel and surrender canceled, to the party of the second part (Atlantic & Pacific Co.), all the overdue coupons on the bonds of said party of the second part now outstanding; *second*, and also agrees to save the parties hereto of the second and third part, severally, harmless from all bonds, scrip, debentures, floating debt, and other obligations and liabilities of the party of the second part, as well against such as are hereinbefore enumerated, classified and described, as any and all others now existing, and to pay and surrender the same canceled and discharged

to the party of the second part as fast as the same are obtained by the party of the first part, by payment or otherwise," excepting, however, the bonds scheduled at $1,189,905, and at $795,000.

There is a marked difference between the two clauses of the contract. In the first there is an undertaking on the part of the San Francisco Company to pay the over-due coupons. The state's demand does not come within that clause. By the second clause the San Francisco Company agrees to save the other contracting companies harmless from the other obligations and liabilities of the Atlantic & Pacific Company, whether scheduled or not. This is the clause upon which the state does, and must, rely. Thus far this clause is nothing more than an agreement to save the other parties harmless, that is to say, an agreement of indemnity. It is true this clause goes on to say the San Francisco Company shall "pay and surrender the same, canceled and discharged, to the second party as fast as the same are obtained by the party of the first part, by payment or otherwise;" but these words are subordinate to the agreement to save harmless, and were designed to give a further expression to the same thought. They can not have the effect to change the agreement from one of indemnity to a contract made for the benefit of third persons. It was certainly never intended that the San Francisco Company should pay any obligation to which the Atlantic & Pacific Company had a defense of any kind. Taking the contract as a whole and keeping in view its general object and purpose, it is simply an adjustment of affairs as between the parties thereto, and was never designed or intended to be a contract for the benefit of third persons.

As the claim of the state is a large one, and as it was not set down in the schedule of debts and obligations to the Atlantic & Pacific Company, and, as it

did not appear upon the books of that company, counsel for defendant insist it can not be held to come under the words "any and all others now existing." These words, it is said, should not be "construed to enlarge the purpose and intention of the parties beyond mere minor claims of the same class and character as those specifically described." We can not agree to this construction of the contract. Suppose the state should recover on its present demand in a suit against the Atlantic & Pacific Company. In such a case there can be no doubt but it would be the duty of the San Francisco Company, under the terms of this agreement, to save the other companies harmless from the judgment thus obtained by the state.

The further argument is pressed upon us that the defendant should not be held liable in this action because the Atlantic & Pacific Company is now insolvent and has never paid the notes agreed to be paid, and which were executed by it to defendant, amounting to $711,958.87. We shall not pursue this line of argument. We think this case turns on the broader ground that this contract between these three companies was designed and intended as an adjustment of matters as between themselves, and that it is not, in any of its provisions, a contract made for the benefit of third persons. Besides this, the particular clause upon which the state places its right to recover as against this defendant, is nothing more than an agreement of indemnity running to, and for, the benefit of the two other parties to the contract, and not to third persons. This tripartite contract does not fall within the rule which we have before applied to the deed from the South Pacific Company to the Atlantic & Pacific Company. The state, therefore, has not now, and never did have, any cause of action against the San Francisco Company.

With the conclusion just stated, the defense, based on the statute of limitations, becomes unimportant and need not be considered. The judgment is affirmed. All concur.