### MERCANTILE TRUST CO. v. ST. LOUIS & S. F. RY. CO.

(Circuit Court, E. D. Missouri, E. D. January 13, 1896.)

#### No. 3,768.

RAILROAD RECEIVERSHIP—LEASED LINES—DISAFFIRMANCE OF LEASES.

During the years 1886 and 1887 four railroads connecting with the line of the S. Ry. Co. were leased by separate leases, for long terms, to that company. At the time of making the leases, each of the lessor com-

panies made an issue of bonds, secured by mortgage, and the leases provided for minimum rentals equivalent to the interest on such bonds, to be paid directly to the bondholders. By the provisions of such leases the S. Ry. Co. also became the owner of practically all the stock of the lessor companies. Subsequently the S. Ry. Co. made a mortgage of all its property, including its interest as lessee in the leased lines and the stock of the lessor companies, to the M. Trust Co., to secure an issue of bonds. The M. Trust Co. covenanted that, in the event of its taking possession of the mortgaged property, it would operate the railroads of the mortgagor, collect its income, and pay therefrom, among other things, all amounts due for principal or interest of any of the bonds or obligations of the S. Ry. Co., and, after such payments, would apply the net income to the interest on the mortgage made to it. The M. Trust Co. afterwards filed a bill for the foreclosure of this mortgage, in which it averred that it was important to hold the system of the S. Ry. Co. as a unit, and prevent the exercise of rights of re-entry by the lessor companies, but the receiver appointed in the foreclosure suit afterwards applied for leave to disaffirm the leases from such lessor companies, which application was opposed by the trustees of the mortgages made by those companies. Upon a reference to a master, it was found that none of the leased lines were earning enough to pay in full the rentals under the leases, but it appeared that this finding was based on the business of an exceptionally bad year, which might be supposed not to be a fair criterion; and it also appeared that the leased lines were valuable feeders to the main line for through business. The master found that equity required the receiver to make good the deficiencies in the earnings of the leased roads from the earnings of the whole line, and that, for the advantage of the trust confided to the receiver, none of the leases should be disaffirmed. *Held,* that such conclusion was correct, both in consideration of the peculiar facts of the case in regard to the situation of the several roads and because, while the question was one between the trustees for the bondholders of the leased roads and the M. Trust Co., trustee in the mortgage on the whole system, the latter company had agreed, if it should take possession of the road, which it had done indirectly by foreclosure proceedings, to apply the earnings of the whole road to the payment of the interest on the bonds of the leased roads, before payment of the interest on the bonds secured by its mortgage. Quincy, M. & P. R. Co. v. Humphreys, 12 Sup. Ct. 787, 145 U. S. 82, and St. Joseph & St. L. R. Co. v. Humphreys, 12 Sup. Ct. 795, 145 U. S. 105, distinguished.

In the matter of the receivers' petition for authority to disaffirm contracts with certain leased lines. On exceptions to master's report.

Alexander & Green and J. E. McKeighan, for complainant.

E. D. Kenna, for receivers.

Noble & Shields, Gleed, Ware & Gleed, Burrill, Zabriskie & Burrill, and L. F. Parker, for defendant.

ADAMS, District Judge. By the order appointing receivers in this case, made on the 23d day of December, 1893, they were required to take possession of and operate the railroads and properties of the defendant, including such as "it holds, controls, or operates under lease," etc. At that time the defendant held, controlled, and operated under separate leases executed during the years 1886 and 1887, for long terms of 98 or 99 years, among other railroads, the following: The St. Louis, Salem & Arkansas Railway, called the "Salem Branch"; the Kansas City & Southwestern Railroad,

called the "Beaumont Branch"; the St. Louis, Kansas & South-western Railroad, called the "Anthony Branch"; and the Kansas Midland Railroad, called the "Midland Branch." By an order made on the 12th day of September, 1894, the receivers were given until the 12th day of December, 1894, within which to determine whether it was to the advantage of the trust committed to them to adopt, among other executory contracts, the leases under which the defendant was operating these several branches. On the 8th day of December, 1894, the receivers presented a petition setting forth in detail the reasons why, in their judgment, the leases of said branches should not be adopted, and recommending that an order be made to that effect. By an order made on that day this petition was referred to George D. Reynolds, Esq. special master, with instructions to hear and determine the same, and report "whether it is to the advantage of the trust confided to the receivers in this cause that such leases should be disaffirmed by them." Before proceeding with the hearing, the master was required to give notice thereof to each of said lessor railroads or branches, and to each trustee in any mortgage executed by them under which there were any outstanding bonds. Like notice was also required to be given to the trustees in any and all other underlying mortgages covering any portion of the system of railways in the possession of the receivers. These notices were all given, and pursuant thereto the complainant, the Mercantile Trust Company, and the trustees in the several mortgages hereinafter referred to, executed by the Salem Branch, the Beaumont Branch, the Anthony Branch, and the Midland Branch, appeared before the master and were heard.

The complainant is the trustee in what is known as the "consolidated mortgage," executed by the defendant company under date June 11, 1891, conveying all its property, including its interest as lessee in said branch roads, to secure the payment of an issue of bonds amounting to $50,000,000. This is the mortgage sought to be foreclosed by this suit. Contemporaneous with the execution of the several leases by the branch roads already mentioned to the defendant company, the said branch roads, each for itself, executed mortgages to secure the payment of an issue of bonds made by them respectively. By the covenants of the several leases the defendant company agreed to pay a rental, in semiannual installments, adjusted so as to fall due when the coupons matured on the bonds. The amount of this rent depended upon the gross earnings of the lessor companies, but in no event was it to be less than the amount required to meet the interest on the bonds. By the provisions of these leases, the defendant company became the owner of practically all the capital stock of each lessor company, and obligated itself, in case of default by the lessor companies, to pay the interest due from them on their bonds directly to the trustees of their bondholders, or to the bondholders themselves. There appear to be several other issues of bonds by the defendant company, secured by underlying mortgages on the whole or some parts of its railway, but none of the trustees named in these mortgages appeared

before the master, or took any interest in the matter. The reason for this is obvious from the record. The income of the road is entirely sufficient to insure the payment of their interest as it matures. The real controversy, therefore, is between the Mercantile Trust Company, representing bondholders under the consolidated mortgage of 1891, and the several trustees representing the bondholders under the prior mortgages of the four several branch roads.

The master finds that neither of these branch roads makes net earnings sufficient to pay the interest on their bonded indebtedness, which, as already observed, is the minimum rental reserved in their several leases to the defendant company. He also finds that the net income derived by the receivers from the operation of all the roads of the defendant company in their hands is sufficient to pay the interest on all mortgage bonds (including those of the four branches under consideration) prior in time and right to the bonds issued under the consolidated mortgage, but is not sufficient to pay the interest also on the last-mentioned bonds. The amount required to pay the annual interest on the bonds of the four branch roads is $193,380. The real question for determination, therefore, is whether this last-named sum shall be paid annually to the bondholders of the branch lines, and their roads be kept, managed, and operated by the receivers, or whether these branch roads shall be surrendered by them, this outlay saved, and this amount finally be added to the security of the bondholders under the consolidated mortgage represented by the complainant in this case.

The master, in his report, calls attention to the averments of the pleadings, the language of relevant leases and mortgages, and the orders of court heretofore made in this case (all of which, so far as deemed material, will be hereafter noticed), and, after analyzing and considering the testimony taken by him, reports to the court as follows:

"First. That none of said leased lines are at the present time, even when allowed a fair and reasonable arbitrary division of through rates on traffic, earning in themselves an amount sufficient, after paying operating expenses and taxes, to pay the rental in full under the various leases under which they are operated by the receivers. Second. That equity in the administration of their trust, considering all the facts and circumstances in the case, does require the receivers to make good any deficiency in earnings directly derived from the said four leased lines, necessary to pay operating expenses, taxes, and rental, out of the earnings of the whole line. Third. That in consideration of all the facts in the case as shown by the evidence adduced before me, it is to the advantage of the trust confided to the receivers in this cause by the court that none of such leases should be disaffirmed by them."

In due time the complainant and each of the trustees for the branch bondholders filed exceptions to the master's report. Said trustees, in their exceptions, do not question the conclusion reached by the master, but only the correctness of some of his findings. On the argument their exceptions were practically abandoned. The exceptions of the Mercantile Trust Company challenge the correctness of the conclusion reached by the master. His conclusion of fact that the branch lines do not earn a net amount sufficient to pay

their rentals is based chiefly upon the results of the business of the year 1894. The failure of crops, and the general depression of business during that year, and the prior systematic diversion of traffic from these branches by reason of the business expediency of furnishing the long haul to the Atchison, Topeka & Santa Fé Railroad Company, to which the stock of the defendant company belonged, afford some ground for believing that the business of the year 1894 does not afford a fair criterion for measuring the real earning power of these branches. Again, the opinions of experts; the fertility and general thrift of the regions through which these branches run, and the probable natural increase of business furnished by them, as feeders, to the main line; the disproportion between the gross earnings contributed to the main line by the branches and the necessary increase in the gross expenses of the main line occasioned by the business contributed by the branches,—all have a strong tendency to show that it would not be advisable to disrupt the system by surrendering the branches; in other words, that it would not be to the advantage of the trust under administration, to dismember its corpus. This view derives strong support from the fact that intelligent men, keenly alive to their own interests, and to the interests of the corporation they represented, studiously provided in their contracts acquiring these branches, and in their subsequent dealings with them (all of them of comparatively recent date), for such treatment of these branches as practically merged them with the main line, requiring them to be operated as a continuation and extension of the main line, and as a unit with it. The complainant itself, at the time of instituting this suit was of the same opinion. The seventh paragraph of the original bill of complaint states, in substance, that the bonds secured by the various mortgages made by the defendant and the several branch-road companies are each capable of separate default and of separate foreclosure of such part of the railroad system of defendant railway company as is covered by them, and complainant avers "that a separate foreclosure of any one of said mortgages or liens would be disastrous to the entire system." It is further averred in the original bill that the railroads and property as now held and controlled by the defendant railway company "forms an important trunk line, which constitutes one of the most important ingredients of its value, and that its severance would result in a ruinous sacrifice of every interest in the property; that, unless this court, in view of the impending and inevitable default as aforesaid, will deal with the property as a single trust fund, and take it into judicial custody for the protection of every interest therein, individual creditors will assert their remedy in different courts in said several counties; * * * that divers of the lessors of the railroads now operated by the defendant as aforesaid may enforce the re-entry covenants of their leases; that a continual default of the mortgage debts may, by the terms of the various mortgages, produce the immediate maturity of all the bonds secured by said mortgages; that a vast and unnecessary multiplicity of suits will result, and a most important and valuable property will

be dismembered by the clashing decrees of many courts at the suits of separate creditors; * * * that the unity of the property and its integrity as a whole, as now held and operated, constitutes one of the most important elements of its value, and that to permit its severance will result in ruinous sacrifice of every interest in said property; * * * that unless such a course is pursued, to wit, the taking of the property into judicial custody, said property will be dismantled, dissipated, and dismembered, and vast sums of money will be lost to the various creditors and stockholders of said company, and the public interests seriously affected." These averments were admitted to be true by the defendant company in the answer filed by it to the bill of complaint; and on motion of the Mercantile Trust Company the court at once appointed receivers, with plenary powers to take immediate possession of all and singular the railroads and properties of the defendant company, and "to continue the operation of said railroad and system, and every part and portion thereof, and to run, manage, and operate said railroads, and such other railroads as the said defendant railway company holds, controls, or operates under lease, contract, arrangement, or otherwise, and as heretofore run and operated." It is true, these averments and orders do not operate as an estoppel against the complainant in the assertion of its present demand (New York, P. & O. R. Co. v. New York, L. E. & W. R. Co., 58 Fed. 268, 282), but they are serious and solemn declarations of record, against interest, supported by affidavit, and acted upon by the court. They are, therefore, entitled to and should receive due consideration in the determination of the question of fact before the court.

It must be admitted that the foregoing considerations cast much doubt upon the wisdom of the recommendation of the receivers to disrupt the system by surrendering these promising feeders. But here the court is confronted with what is called controlling authority. The cases of Quincy, M. & P. R. Co. v. Humphreys, 145 U. S. 82, 12 Sup. Ct. 787, and St. Joseph & St. L. R. Co. v. Humphreys, 145 U. S. 105, 12 Sup. Ct. 795, hold, in substance, that in cases where the net earnings of leased lines as operated by the receivers are not sufficient to pay the rentals, the earnings of the main line or the proceeds of the sale of the trust property ought not to be diverted to making up such deficiency. It is further held in these cases that receivers, by reason simply of their appointment and taking possession of leased lines, incur no liability, as assignees of the lessees, to pay the rent reserved in the leases; that they have a reasonable time after taking possession within which to consider whether it is for the best interests of their trust to adopt such leases. It may be remarked here that the receivers in this case, having presented their recommendation to abandon the leased line in question, during the time fixed by an order of court for them to act, are, according to the doctrine of the Humphreys Cases, supra, under no legal obligations, as assignees of the lessees, to pay the rent reserved in the leases. The complainant claims that this court should follow the doctrine of these cases, and permit the receiver to surrender the

branch lines in question.   This would doubtless be so if the case at bar presented no other features than those presented in the Humphreys Cases, supra.   But, in my opinion, there are several distinguishing differences between the cases.   In the first place, the Humphreys Cases presented few, if any, of the peculiar facts or broad equitable considerations presented in this case, and already adverted to.   Again, the receivers were appointed in those cases at the instance of the mortgagor, and no representations of the trustee for the bondholders were made to the court to induce it to act, and no such recommendations were relied upon by the court in making the order of appointment.   In the next place, the supreme court, in its opinions in the Humphreys Cases, takes manifest pains to say that the mortgagees never consented to have the rentals charged upon the property in preference to their mortgages.   In the first case (145 U. S. 104, 12 Sup. Ct. 787) the court says: "Nor did the mortgagees consent to have the claim charged upon the corpus of the property in preference to their mortgages."   In the second case, on page 115, 145 U. S., and page 795, 12 Sup. Ct., the court says: "And we find no assent by the mortgagees to the allowance of this claim as against them."   These references clearly indicate that, if there was such assent, a different result would have followed.   In the case at bar I believe there is not only such assent, but a contract obligation, so far as the Mercantile Trust Company is concerned, requiring the payment of the interest on the bonds of the four leased lines in question prior to any claim it has under the consolidated mortgage.   It must be remembered, as already shown, that this controversy is really and solely between the Mercantile Trust Company, as representative of the holders of the bonds secured by the consolidated mortgage of 1891, and the several trustees in the mortgages executed by the four branch lines in 1886 and 1887, as representatives of the holders of the bonds secured by them.

The defendant company conveyed to the Mercantile Trust Company by and in its consolidated mortgage all its main line and branches, including its interest as lessee in the leases of the four branch roads in controversy, all specifically described in the mortgage; and also transferred practically all of the capital stock of the several corporations owning these four branches, thereby vesting the Mercantile Trust Company, under conditions expressed in the mortgage, with full power to operate and control these branches.   The defendant company, at the time of this conveyance to the Mercantile Trust Company, was under obligation, created in the several leases to it from these branch lines, to pay the interest on their bonds; and this obligation was known to the Mercantile Trust Company when it took the consolidated mortgage conveying to it the properties already referred to.   In consideration of the conveyance to it as aforesaid the said Mercantile Trust Company covenanted, in the event of such default on the part of the mortgagor as entitled it, under the terms of the mortgage, to take possession of the mortgaged property, and in the event of taking such possession, as follows, to wit: To "operate said railroads, and conduct the business of the railway

company, and exercise the franchises pertaining thereto, and receive all tolls, rents, income, and profits from said railroad and other property, and the interest upon all bonds and the dividends upon all shares of capital stock then held by the trustee under the provisions of this mortgage, and from such receipts to pay all expenses of taking possession of said railroads and other property, and operating said railroads and conducting said business, and the expenses of such repairs, replacements, alterations, additions, and improvements to the mortgaged property as the trustee shall deem needful, and all taxes due upon any of the mortgaged property, and all amounts due for interest or principal of any of the bonds or other obligations of the railway company secured by any mortgages or pledges prior in lien to this mortgage; and, after deducting such expenses and payments, and retaining a reasonable compensation for the services of the trustee in connection with the making of said entry and taking possession of said railroads and other property, and operating the same, and conducting the said business, to apply the net income to the payment of any interest previously due or becoming due during such possession on bonds secured by this mortgage." The trustee, the Mercantile Trust Company, also covenanted, in the event of such default on the part of the mortgagor as entitled it, under the terms of the mortgage, to sell the mortgaged property at public auction, and in the event of such sale, as follows, to wit: "To cause all of the railroads and other property there secured by this mortgage, including all shares of capital stock and bonds held in trust under the provisions hereof, to be sold as one property at public auction," etc. To say nothing now of the obligations cast upon the Mercantile Trust Company by reason of this last-mentioned covenant, I am of the opinion that the first-mentioned covenant constituted a contract on the part of the Mercantile Trust Company, trustee in the mortgage, in the event it took possession of the railroads of the defendant company for condition broken, to pay the interest on the bonds of the four branch roads in question, as obligations of the mortgagor, before it should apply the net income to the payment of any interest due or to become due on the bonds secured by the consolidated mortgage held by it. And this is all that is now asked by the trustees representing the holders of the bonds of the leased lines. But it is said by counsel for the Mercantile Trust Company that it did not take possession of the mortgaged property. True, it did not do it directly, but it did it indirectly. It resorted to a concurrent remedy, provided by the mortgage, to accomplish the same purpose. It instituted a foreclosure suit, and prayed the court to take the possession. The court did so, and has been, and now is, operating the railroads and conducting the business exactly as the trustee, the Mercantile Trust Company, might have done had it taken possession for the purposes contemplated in the mortgage.

The provisions of the mortgage authorizing the trustee to foreclose by suit are silent as to the disposition of the net earnings of the system during the pendency of the foreclosure proceedings. But the four corners of the mortgage and all its terms and provisions must

be considered in placing a construction upon any of its clauses, and in doing so I am forced to the conclusion that the parties intended, in the event possession was taken by the trustee directly in person, or indirectly through receivers appointed at their instance by the court, that the property mortgaged, including the leased lines in question, should, during such possession, be operated as a unit, and that out of the income therefrom the interest on the bonds of the leased lines should be paid before any of it should be applied to the payment of the interest on the bonds secured by the consolidated mortgage itself. This manifest intention cannot be thwarted, at the will of one of the parties, by the exercise of choice in the detail of methods merely of taking possession. Not only so, but the holders of the bonds of the four branch roads in question are the beneficiaries of this covenant, obligation, or promise, and under the authority of the case of State v. St. Louis & S. F. Ry. Co., 125 Mo. 596, 28 S. W. 1074, and cases there cited, they, although not nominally parties to the contract, may invoke this covenant in their favor. To say nothing of their legal rights, they certainly have, by virtue of these covenants, an equity superior to that of the covenantor, the Mercantile Trust Company, in the net earnings of the entire system. These considerations not only show that the Humphreys Cases, supra, are inapplicable to this case, but afford additional, and, in my opinion, conclusive, reasons for requiring the defendant's system to be held intact, and to be operated as a unit, even at the expense of retaining the four branch lines in question, on the terms of the leases as they exist.

The correctness of this conclusion is emphasized by a consideration of the alternatives suggested by counsel for the Mercantile Trust Company, namely, to permit the owners of these branch roads to take possession and operate them, or make such new running arrangements with the receivers as will be mutually satisfactory. The Mercantile Trust Company, being the holder of practically all the stock of these branch roads, is the owner, for all practical purposes, of the roads themselves, and probably, considering its present views, would not find it convenient or profitable to operate the roads separately; and any running arrangements it might make with itself would probably not be dictated by an entirely unselfish consideration for the welfare of the branch bondholders.

Again, it is suggested in argument that the receivers be permitted to continue operating the branch roads in question, and pay to the bondholders whatever net income they derive from such operation. This might do if the bondholders consented, but they do not. They are here asserting a claim for payment in full, and such an order as is suggested would necessarily be subject to their approval, which they have, in advance, declined to give. The alternatives suggested, therefore, afford no escape from the conclusions first reached.

Entertaining the views already expressed, it does not seem necessary to rule on the several exceptions as made. The conclusion of the master, in my opinion, is correct. The exceptions of all parties are therefore disallowed, and his report will be confirmed.